UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL INSTITUTE FOR THE BRAIN, LTD.,

                  Plaintiff,

-against-

KATELYN NEWMAN,

                  Defendant.

Case No.: 1:23-cv-00638-JPO

**AMENDED COMPLAINT**

---

Plaintiff International Institute for the Brain, Ltd. ("iBrain" or "Plaintiff"), as and for its Amended Complaint against defendant Katelyn Newman ("Defendant" or "Newman"), alleges as follows.

## NATURE OF ACTION

1. This is an action to put a stop to Defendant's malicious infringement of iBrain's copyrighted photographs of its physically and mentally disabled young students, which she is using unlawfully in her campaign to defame iBrain, an educational program for children with brain injuries and brain-based disorders.

2. Defendant is a disgruntled former marketing employee of iBrain. Defendant's tenure at iBrain lasted less than four months. She abruptly resigned in December 2022, after iBrain refused her unreasonable demands for a raise, an upgrade in title, a personal assistant, and close collaboration with "upper management."

3. In an outrageous act of spite, Defendant then embarked upon a malicious and defamatory social media campaign, falsely accusing iBrain and its personnel of serious crimes and of jeopardizing the well-being and physical safety of iBrain's students.

4. First, Defendant falsely and defamatorily – and grotesquely – accused iBrain of

being run by a child abuser. Specifically, Defendant asserted that iBrain's founder and chairman, Patrick Donohue ("Donohue"), caused physical harm and brain damage to his own infant daughter, despite the well-publicized 2005 arrest of, and subsequent confession by, the family's baby nurse that she committed that heinous crime (not only to Donohue's daughter, but to another child as well).

5. Second, Defendant falsely and defamatorily accused iBrain's chairman (Donohue) and its deputy director, Arthur Mielnik ("Mielnik"), of embezzling and misappropriating funds.

6. Third, Defendant falsely and defamatorily accused iBrain of being "filled with ex-cons" and of being a "corrupt institute."

7. Fourth, Defendant used a lawsuit that she filed in New York state court against iBrain and certain of its individual personnel, purportedly for, *inter alia*, labor law and defamation claims, as a blatant device to make more libelous *per se* statements about iBrain, which Defendant erroneously assumed would be shielded from liability for defamation under the litigation privilege. As alleged below, however, no litigation privilege attaches to or protects Defendant's sham, defamatory statements that litter her state pleading.

8. Making matters worse, Defendant has used and exploited copyrighted photographs of iBrain's disabled students as poster-children and pawns for her social media campaign of defamation, which is calculated to irreparably harm iBrain in its business and reputation.

9. Defendant was sent two cease-and-desist demands, which she ignored. Instead, she continued with her online defamatory campaign *after* being served with process and iBrain's initial Complaint in this action. iBrain is thus constrained to seek the Court's help.

10. iBrain brings claims for copyright infringement, defamation *per se* and breach of contract, as specifically alleged below.

11. iBrain also seeks a preliminary and permanent injunction to put a stop to Defendant's posting of copyrighted photographs of iBrain's students. iBrain's students (and their parents) should not be collateral damage to Defendant's spiteful effort to get back at iBrain for refusing her attempt to squeeze iBrain for an increased salary and promotion.

## PARTIES

12. iBrain is an independent, not-for-profit organization organized under New York Not-for-Profit Corp. Law § 402, located in New York, New York.

13. Upon information and belief, Defendant is an individual and a resident of New York, New York.

## JURISDICTION & VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because iBrain asserts a claim against Defendant arising under the U.S. Copyright Act, 17 U.S.C. §§ 101 *et seq*. This Court has supplemental jurisdiction over iBrain's state law claims against Defendant pursuant to 28 U.S.C. § 1367(a) because such claims are part of the same controversy and derive from a common nucleus of operative facts.

15. This Court has personal jurisdiction over Defendant pursuant to CPLR § 301 because Newman is a resident and domiciliary of New York.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Newman is a resident of New York within this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS

**iBrain's Founding & Non-Profit Business**

17. iBrain is a not-for-profit organization that promotes the research, development and implementation of special education and related services for students with brain injuries and brain-

based disorders.

18. Donohue, iBrain's founder and chairman, was inspired to create iBrain following the trauma inflicted on his infant daughter, Sarah Jane, by their family's baby nurse in 2005.

19. That baby nurse, Noella Allick ("Allick"), was arrested and confessed to First Degree Assault with Depraved Indifference for having violently shaken Sarah Jane, causing her permanent brain damage.

20. Allick confessed to the same crime in connection with another child.

21. Allick was sentenced to 10 years in prison. The case was well publicized at the time, including in *The New York Times*. (https://www.nytimes.com/2006/10/27/nyregion/nurse-who-shook-baby-causing-brain-damage-is-sent-to-prison.html.)

22. Donohue launched the Sarah Jane Brain Foundation in 2007. He founded iBrain in 2018.

23. iBrain's programs serve students aged between 3-21 years old.

24. Given the unique academic, emotional and medical needs of iBrain's student community, iBrain employs a staff of specialized teachers, paraprofessionals, therapists and medical personnel who work together to develop each student's academic, cognitive and social skills with an individual approach that accounts for each student's particular needs.

25. iBrain also offers a range of therapeutic services to its students, including speech and language therapy, occupational therapy, physical therapy, aquatic therapy and music therapy.

26. iBrain charges only a $100 refundable deposit for enrollment, with all other costs suspended while the parents obtain funding under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*

27. iBrain receives its funding from government programs and from private donations.

**Newman's Short Tenure As iBrain's Marketing Associate**

28.     iBrain's marketing and promotion of its activities is critical to its fundraising, enrollment of students and recruitment of specialized staff.

29.     Defendant, who has a background in public relations, was hired on August 30, 2022 as iBrain's Marketing Associate.

30.     Defendant's job responsibilities included assisting with the generation of social media content, including taking pictures of iBrain's students and staff for the school and its Instagram, Twitter and Facebook accounts and website, and supporting the management of iBrain's social media accounts.

31.     iBrain has registered with the U.S. Copyright Office photos of its students and staff taken by Defendant as well as by other iBrain marketing employees.  The photographs that are presently at issue in this case (the "Photographs," which are described further below) are registered under Federal Copyright Registration Nos. VAu001489033 (group of five unpublished photographs of iBrain's students) and VA0002333464 (one published photograph of a disabled iBrain employee).  (Copies of the Photographs subject to these registrations are annexed collectively as **Exhibit A**.)[1]

32.     At the start of her employment, on August 30, 2022, Defendant signed an agreement called "Acknowledgment of Receipt of iBrain Property & Obligations to Protect iBrain's Interests" (the "iBrain Property Agreement").  (A copy of the iBrain Property Agreement is annexed as **Exhibit B**.)

33.     The iBrain Property Agreement states (*inter alia*) that all "iBrain work product, materials and/or information is Proprietary Information of iBrain and [Defendant] shall not use it

---

[1] To protect the identity of iBrain's students and employees in this filing, the Photographs in Exhibit A have been redacted to hide identifying facial features.

in any way adverse to iBrain's interests."

34. The iBrain Property Agreement further states that, upon Defendant's employment termination, she would submit her personal devices to iBrain "to review my personal devices and equipment for iBrain Proprietary Information, work product, privileged and confidential information and/or other of its valuable intellectual property, and transfer any or all of the above onto iBrain storage files and delete it from my personal device(s)."

35. The iBrain Property Agreement also states that Defendant would not "reproduce or in any way allow such Proprietary Information to be delivered to or used by any third party without iBrain's specific direction or consent. I understand that I have no rights in such Proprietary Information."

36. Defendant further agreed under the iBrain Property Agreement not to "make any statements, or take any other actions, *whatsoever* to disparage, defame, sully or compromise the goodwill, name, brand or reputation of iBrain or commit any other action that could likely injure, hinder or interfere with the business, business relationships or goodwill of iBrain."

37. Also at the start of Defendant's employment, on August 30, 2022, she received the iBrain Handbook (the "Handbook"). Among other things, the Handbook states that iBrain's employees will "[n]ever post any identifying student information, including names, videos, and/or photographs on any personal social media accounts, including, but not limited to Facebook, Instagram, Twitter, Vine, Snapchat, LinkedIn etc. without prior approval" from iBrain. (An excerpted copy of the iBrain Handbook is annexed hereto as **Exhibit C**.)

38. Defendant's tenure as iBrain's Marketing Associate lasted less than four months. During that time, her colleagues regularly complained about her poor attitude, including her inability to get along with her co-workers, and her refusal to perform tasks that did not interest her.

39. Defendant nonetheless also frequently complained about the amount of her pay, and within less than three months, on or about October 24, 2022, she began pushing iBrain for a "bump up" in her pay and status.

40. Hoping to generate a more cooperative and better-spirited employee, and hoping not to have to commence another search to fill Defendant's role, iBrain gave Defendant a $10,000 raise.

41. Defendant remained unsatisfied.

42. On December 16, 2022, only four weeks after having received an undeserved raise, Defendant sent an e-mail announcing a temporary leave of absence, which she coupled with a "request to continue working for iBRAIN." (A copy of Defendant's December 16, 2022 e-mail is annexed as **Exhibit D**.)

43. In her December 16 e-mail, Defendant made four demands: (1) a change in job title from Marketing Associate to "PR/VIP Manager," as well as another potential salary increase in three months; (2) "respect"; (3) the appointment of a "PR assistant" who would be the one to liaise with Defendant's work colleagues, as Defendant refused to do so herself; and (4) close collaboration with "Upper Management."

44. Defendant stated that, if iBrain would not comply with those "four things," then she would resign that day.

45. iBrain refused to yield to Defendant's unreasonable and entirely unwarranted demands, and she promptly quit on December 16, 2022.

46. Defendant sent an e-mail to a number of iBrain's staff on December 16, 2022 entitled "A sad farewell," which opened: "Hi all! If you are receiving this email, you at least touched my heart in a way that I will remember and I hope to sincerely stay in touch."

7

**Defendant's Malicious Campaign To Defame iBrain And Its Personnel**

47. The next day, December 17, 2022, Defendant commenced a spiteful and malicious campaign to defame iBrain and its personnel.

48. In a December 17, 2022 Instagram post, Newman stated that iBrain "is filled with ex cons that parents aren't even unaware [sic] of."

49. Defendant's statement was false. In fact, in 2021 iBrain learned of a single employee, named Rodney Robinson ("Robinson"), who was hired in an administrative role and had posed under the false name Alim Shariff and skillfully faked his resume and background, concealing a prior criminal record. iBrain promptly fired Robinson and reported him to the appropriate authorities, and he was arrested and imprisoned.

50. Defendant's statement that iBrain "is filled with ex cons" was false and defamatory, was calculated to harm iBrain's reputation in its trade and business, and was made to scare off families whose children are present or potential iBrain students.

51. In a December 20, 2022 Instagram Post (the "December 20 Post"), Defendant stated that iBrain's founder and chairman, Donohue, "was kicked out of his previous non-profit, @ihopenyc, for embezzling."

52. Defendant's statement was false. In fact, Donohue's former employer, iHope, agreed following his departure that iHope owed Donohue approximately $1 million.

53. Defendant also stated in her December 20 Post that "Donohue puts his 24-year-old CFO, Arthur Mielnik, in uncomfortable position to hide where funds are going and makes his wife, with no background, sign off on all important law documents."

54. Defendant's statements were false.

55. For one thing, Mielnik is not iBrain's CFO; he is iBrain's Deputy Director of Strategic Planning and his responsibilities in this position do not align with those of a CFO.

56. Nor has Mielnik, or any other manager or officer at iBrain, hidden company funds.

57. iBrain's accounting is handled by an outside certified public accounting firm.

58. Nor has iBrain relied on Donohue's wife to "sign off on all important law documents."

59. Defendant continued her false and defamatory attacks on December 22, 2022. On that day, in another Instagram post, Defendant stated that Mielnik "writes off fake purchase for Patrick [Donohue]," meaning, supposedly, "a new Mercedes" for Donohue's wife. This statement was also false.

60. Defendant's false and defamatory statements were calculated to harm iBrain's reputation in its trade and business.

61. Defendant further accused iBrain of endangering the physical well-being of its students by falsely and defamatorily claiming that two of its personnel have physically harmed children in the past.

62. Specifically, in a December 24, 2022 Instagram post, Defendant abhorrently accused Donohue of having shaken his daughter and causing her brain injury, stating: "You should also look into what really happened with Sarah Jane. The woman who went to jail for allegedly shaking her [*i.e.*, Allick] still til this day swears it was really Patrick that did that to SJ and not her."

63. Defendant's statement was false. Allick confessed to harming Sarah Jane, as well as another child, and went to prison.

64. Defendant's false and defamatory statement about iBrain's chairman was calculated to harm iBrain's reputation in its trade and business.

65. Likewise, in the December 20 Post, Defendant outrageously stated that

9

"[Donohue's] partner, Dr. [Victor] Pedro, claims to be a master in neurology, yet he is a chiropractor with multiple sexual assaults."

66.     Defendant's statement was false. Dr. Pedro has never claimed to be "a master in neurology," nor has he ever committed or been charged with a single sexual assault (let alone multiple ones).

67.     In contrast to her libelous statement, Defendant had specifically chosen Dr. Pedro as one of the recipients of her sentimental "sad farewell" e-mail on December 16, 2022.

68.     Defendant's false and defamatory statement about Dr. Pedro was calculated to harm iBrain's reputation in its trade and business. (Copies of Defendant's defamatory Instagram posts described above are annexed collectively as **Exhibit E**.)[2]

69.     After being served with process and iBrain's initial Complaint in this action on January 26, 2023, Defendant continued her online, defamatory tirades against iBrain, this time through LinkedIn. On or about January 31, 2023, Defendant sent at least one unsolicited message to a business affiliate of iBrain, stating: "Wwanted [sic] to confirm you are patterned with [sic] the corrupt institute known as iBRAIN? If yes, no worries. If not, they claim you are one, so I wanted to warn you. I read your impressive background and if you are partnered, I recommend reading the truth online about them."

70.     The so-called "truth online" that Defendant referred to, upon information and belief, are news stories that have disseminated through the New York local press concerning a New York state court complaint that Defendant filed against iBrain and certain of its personnel on or about January 16, 2023 (the "State Court Pleading").

---

[2] Once again, to protect the identity of iBrain's students and employees in this filing, the images contained in Exhibit E have been redacted to hide identifying facial features.

10

71. Defendant's State Court Pleading purports to assert state law claims of sexual harassment and employment discrimination, hostile working environment, wrongful retaliation, defamation and intentional infliction of emotional distress. Nevertheless, in a long-winded introduction to those claims, Defendant includes a number of false allegations that have nothing to do with her purported claims and were inserted for the sham purpose of defaming iBrain in a sensational manner that would be readily accessible to the press, upon the cynical and erroneous assumption that inserting such sham allegations in a pleading gives her license to defame iBrain with impunity.

72. Contrary to any such assumption, however, Defendant's sham-purpose allegations in her State Court Pleading are not protected by New York's litigation shield against claims for defamation. *See Halperin v. Salvan*, 117 A.D.2d 544, 546 (1st Dep't 1986) ("The instant amended complaint sufficiently states a cause of action for libel since it alleges the specific statements made by defendants, publication (i.e., filing with the court and service upon codefendants who were also Halperin's clients), and that the statements were made with malice so as to injure Halperin in his profession. Indeed, the statements, which charge the commission of crimes, are libelous per se."); *Flomenhaft v. Finkelstein*, 127 A.D.3d 634, 636-37 (1st Dep't 2015) ("This Court has recognized, however, that the privilege is capable of abuse and will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendant").

73. A number of local New York press stories have been published that emphasize Defendant's false, malicious, defamatory and sensational allegations in her State Court Pleading that have nothing to do with any of her purported claims in that action.

74. In particular, and as Defendant intended, multiple press reports highlighted Defendant's allegation in her State Court Pleading that "cockroaches were so prevalent" at iBrain's

11

schools "that they were sometimes nested in students' wheelchairs."

75. Defendant's sham allegation is not only immaterial to her purported claims of sexual harassment and employment discrimination, hostile working environment, wrongful retaliation, defamation and intentional infliction of emotional distress, but it is also false. In fact, about a year before Defendant even worked for iBrain, iBrain had accepted a particular student from a very low income family whose home had been infested with cockroaches, and had infested that student's wheelchair. iBrain not only purchased a substitute wheelchair for that particular student, but it paid for an exterminator to treat the family's home and provide an emergency bug bomb. No similar incidents of this kind have occurred at iBrain, as Defendant knows or should have known, and her statement in her State Court Pleading that this sad situation affected multiple "students" and their "wheelchairs" was malicious and false.

76. The press also highlighted Defendant's allegation in her State Court Pleading that "the first thing she noticed was that [iBrain's] facility on East 91st Street was extremely filthy and unsanitary."

77. Defendant's sham allegation is not only immaterial to her purported claims of sexual harassment and employment discrimination, hostile working environment, wrongful retaliation, defamation and intentional infliction of emotional distress, but it is also false. In fact, Defendant *never worked at iBrain's school located at East 91st Street*; she worked at a different location. Both of iBrain's facilities are entirely safe, clean and sanitary.

78. The press also highlighted Defendant's allegation in her State Court Pleading that iBrain "used children as human guinea pigs for [Dr. Victor Pedro's] experiments."

79. Defendant's sham allegation is not only immaterial to her purported claims of sexual harassment and employment discrimination, hostile working environment, wrongful

retaliation, defamation and intentional infliction of emotional distress, but it is also false. In fact, Dr. Pedro never treated or examined any of iBrain's students. Defendant's malicious and deliberately offensive "guinea pigs" and "experiments" language in her State Court Pleading was calculated to defame iBrain with the most sensational language that Defendant conceived (rightly) would grab press attention.

80. Defendant's State Court Pleading is littered with additional sham allegations that are not only immaterial to her purported claims of sexual harassment and employment discrimination, hostile working environment, wrongful retaliation, defamation and intentional infliction of emotional distress, but are also maliciously false.

81. Defendant's false and defamatory sham allegations in her State Court Pleading are maliciously calculated to harm iBrain's reputation in its trade and business, with actual or reckless disregard for the truth.

82. Defendant filed her State Court Pleading with the New York State Court and served her State Court Pleading on co-defendants in addition to iBrain.

**Defendant's Infringement Of iBrain's Copyrighted Photographs**

83. To promote and sensationalize her false statements directed against iBrain, Defendant attached iBrain's copyrighted Photographs to her Instagram posts, thereby making iBrain's disabled students pawns for her defamatory social media campaign. (Exhibit E.)

84. Defendant published and reproduced the Photographs without a license or consent from iBrain, the copyright owner.

85. The copyrights in the Photographs have substantial marketing and fundraising value to iBrain.

86. Defendant's unauthorized use of the Photographs is designed to cause irreparable harm to iBrain by thwarting its marketing and fundraising, by poisoning iBrain's reputation in the

13

market through Defendant's perverse use of the Photographs, and by causing iBrain to lose existing and future student enrollment.

87. Defendant has already disrupted iBrain's business.

88. On December 19, 2022, iBrain's in-house counsel sent Defendant a cease-and-desist letter, demanding that she stop her unlawful conduct and that she return iBrain's property, including but not limited to the Photographs.

89. Defendant ignored iBrain's demand and did not return any of iBrain's property.

90. On December 23, 2022, iBrain's outside counsel sent Defendant another cease-and-desist letter, demanding that she remove all of her defamatory statements and images of iBrain's students.

91. Defendant ignored iBrain's second cease-and-desist demand.

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement)

92. iBrain repeats and realleges paragraphs 1 through 91 above, as if fully set forth herein.

93. Without iBrain's consent, Defendant copied, published, reproduced and displayed iBrain's copyrighted Photographs, in violation of 17 U.S.C. § 106.

94. Defendant's infringements of iBrain's copyrights have been willful, intentional and purposeful.

95. Because the harm caused to iBrain by Defendant's willful copyright infringement is incalculable, iBrain is entitled to an award of maximum statutory damages from Defendant, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each of iBrain's copyrighted Photographs, for a total award of $900,000, or such other amounts as the Court deems proper under 17 U.S.C. § 504(c).

96. iBrain is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

97. Pursuant to 17 U.S.C. § 502, iBrain is additionally entitled to a preliminary and permanent injunction prohibiting Defendant's further infringement of iBrain's copyrights in the Photographs.

**SECOND CLAIM FOR RELIEF**
**(Libel *Per Se*)**

98. iBrain repeats and realleges paragraphs 1 through 91 above, as if fully set forth herein.

99. Defendant has made false statements, as specifically alleged above, about iBrain and its staff in writing.

100. Defendant has published her false statements to third parties.

101. Defendant made her false statements with actual malice and with an intentional or reckless disregard for the truth.

102. Defendant's false statements constitute libel *per se* in that they tend to injure iBrain in its trade and business.

103. As a result of Defendant's false and defamatory *per se* statements, iBrain has been damaged in an amount to be proven at trial, but not less than $1 million.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract)**

104. iBrain repeats and realleges paragraphs 1 through 91 above, as if fully set forth herein.

105. The iBrain Property Agreement is a valid contract between iBrain and Defendant.

106. Defendant breached the iBrain Property Agreement by failing to return iBrain's property following her termination of employment.

107. Defendant additionally breached the iBrain Property Agreement by reproducing iBrain's Proprietary Information and other information described therein without iBrain's consent.

108. Defendant further breached the iBrain Property Agreement by disparaging, defaming, sullying and compromising the goodwill, name, brand and reputation of iBrain.

109. Defendant's above-described breaches of contract have caused damage to iBrain in an amount to be proven at trial, but not less than $1 million.

**WHEREFORE**, iBrain respectfully prays for judgment against Defendant as follows:

1. On the First Claim for Relief: for statutory damages of $900,000, as well as reimbursement of iBrain's attorneys' fees and costs, and additionally a preliminary and permanent injunction enjoining Defendant from infringing any of iBrain's copyrights in the Photographs;

2. On the Second Claim for Relief: for an award in an amount to be determined at trial, but not less than $1 million;

3. On the Third Claim for Relief: for an award in an amount to be determined at trial, but not less than $1 million; and

4. Such other and further relief as this Court deems just and proper.

Dated: New York, New York
February 2, 2023

PRYOR CASHMAN LLP

By: ___*s/ William L. Charron*___
William L. Charron
(wcharron@pryorcashman.com)
Tom J. Ferber
(tferber@pryorcashman.com)
John M. Kilgard
(jkilgard@pryorcashman.com)
7 Times Square
New York, New York  10036
(212) 421-4100

*Attorneys for Plaintiff International Institute for the Brain, Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2023, I served the foregoing Amended Complaint on counsel for Defendant by filing the Amended Complaint with the Court's CM/ECF system and causing the Amended Complaint to be sent via electronic mail and U.S. mail to counsel for Defendant at the following address:

> Kenneth F. McCallion
> McCallion & Associates LLP
> 100 Park Avenue – 16th floor
> New York, New York 10017
> kfm@mccallionlaw.com

<i>s/ William L. Charon</i><br>
William L. Charron